FILED

October 27 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0068

DA 15-0068

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 309

JON G. CRUSON,

      Plaintiff and Appellant,

   v.

MISSOULA ELECTRIC COOPERATIVE, INC.
and STATE OF MONTANA, DEPARTMENT OF LABOR
and INDUSTRY, UNEMPLOYMENT INSURANCE DIVISION,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 14-258
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            David C. Berkoff, Berkoff Law Firm, P.C., Missoula, Montana

            Nate McConnell, McConnell Law Office, P.C., Missoula, Montana

      For Appellees:

            David B. Cotner, Datsopoulos, MacDonald & Lind, P.C., Missoula,
Montana

            Edward "Rusty" Murphy, Murphy Law Offices, PLLC, Missoula,
Montana

Submitted on Briefs:  August 26, 2015
Decided:  October 27, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Jon G. Cruson appeals the decision of the Fourth Judicial District Court, Missoula County, affirming the Board of Labor Appeals' (Board) denial of unemployment benefits to him. We restate the issue on appeal as follows:

*Whether the District Court erred when it affirmed the Board's conclusion that Cruson was disqualified for unemployment benefits because his voluntary termination did not constitute "good cause attributable to the employer."*

¶2     We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     Missoula Electric Cooperative, Inc. (MEC) employed Cruson as a master electrician from October 1, 2001, until May 20, 2013. In 2009, Mark Hayden began working as the general manager for MEC. Shortly thereafter, Cruson complained to Hayden and members of MEC's management and board of directors that unqualified employees were performing work that only an electrician could perform. Cruson complained that having unqualified servicemen and linemen performing electrical work jeopardized his Master Electrician's License.

¶4     In response to Cruson's complaints, Hayden implemented a computer system in late 2010 or early 2011 that allowed employees like Cruson to review whether work orders were being assigned properly. Hayden also advised supervisors to remind employees that they were not allowed to perform work beyond their capabilities and licensure.

2

¶5     Also in response to Cruson's concerns, MEC contacted the Montana State Electrical Board in June 2012 for guidance regarding the scope of practice of a lineman versus an electrician.  In February 2013, Anne O'Leary, attorney for the Electrical Board, sent an email to MEC confirming that certain electrical work is outside the scope of a lineman's practice.

¶6     On or about August 4, 2012, MEC posted a vacancy announcement for an apprentice lineman position.  Cruson submitted his application for the position, which paid an hourly wage approximately 40% less than his master electrician's wage.  In September 2012, MEC announced that it would not hire any of the applicants for the apprentice lineman position.

¶7     Cruson continued working as a master electrician for MEC after learning that he had not been hired for the apprentice lineman position.  He did, however, file an age discrimination claim against MEC with the Montana Human Rights Bureau (Bureau).  The Bureau issued a cause finding in Cruson's favor on April 13, 2013.  Four weeks later, MEC sent an e-mail to the Bureau making an unconditional offer of the apprentice lineman position to Cruson.  Cruson rejected the offer.

¶8     In the meantime, Cruson did not encounter any other issues regarding unqualified work until March 2013, when—using Hayden's computer system—he discovered three additional instances where work had been performed by unqualified employees ten years earlier, in March 2003.  In April 2013, an MEC Operations Specialist advised Cruson of

another work order showing impermissible work by a serviceman in the fall of 2012. Hayden claims that he did not learn of these instances until after Cruson quit.

¶9 Cruson resigned from his position on or about May 19, 2013. After leaving MEC, Cruson filed a claim for unemployment benefits with the Montana Department of Labor and Industry's Unemployment Insurance Division (Department). The Department initially determined that Cruson was disqualified from receiving benefits, stating that his separation from MEC was without good cause attributable to his employment as required by § 39-51-2302, MCA. Cruson filed a Request for Redetermination with the Department. In November 2013, the Department overturned its original finding and granted Cruson unemployment insurance benefits beginning on the date of his resignation.

¶10 Following the Redetermination, MEC filed a request for appeal with the Montana Department of Labor and Industry, Hearings Bureau (Hearings Bureau). The Hearings Bureau conducted a hearing on December 9, 2013, at which Cruson and MEC were represented by counsel.

¶11 At the hearing, Cruson testified that he quit, in part, due to the stress and anxiety he felt knowing that MEC employees were being directed to or allowed to perform work beyond their capabilities, and that jeopardized his Master Electrician's License. Cruson acknowledged that he had not received any disciplinary threats against his license for such unauthorized work. Cruson testified that MEC had done little or nothing to address

4

his concerns. Cruson stated that he quit after being offered the apprentice lineman position because the hourly wage was 40% less than his wage as a master electrician.

¶12 Hayden testified that he addressed all of Cruson's concerns. He testified that supervisors and other members of management were instructed that they could not allow or encourage MEC employees to perform work beyond their capabilities and licensure. Hayden testified that he implemented a computer system to track work orders in an attempt to correct the problems. Hayden testified that he and other supervisors discussed various scenarios in which employees may be asked to perform work beyond their capabilities and thought that MEC was operating within the confines of the law. Hayden denied being aware of the issues Cruson discovered in March and April 2013.

¶13 The hearing officer found that MEC attempted to address Cruson's concerns as they arose and concluded that "the evidence shows [the] reason offered for quitting does not constitute good cause attributable to the employment." The Hearings Bureau reversed the Department's Redetermination and concluded that Cruson was disqualified from receiving benefits.

¶14 Cruson appealed to the Board in December 2013. On February 11, 2014, the Board adopted and affirmed the decision of the Hearings Bureau. The Board's written decision concluded that "while both parties made compelling arguments . . . substantial evidence supports that there was no unreasonable action(s) by the employer." The Board noted that "while Cruson may have had good personal reasons for leaving his

employment, substantial evidence supports that he did not show he left work for good cause attributable to his employment."

¶15   Cruson petitioned the District Court for judicial review, arguing that the Board erred by misapplying the legal standard regarding good cause attributable to the employer.   Cruson also argued that the Hearings Bureau and Board improperly considered MEC's offer of the lower paying apprentice lineman position when weighing Cruson's eligibility for unemployment benefits, or in the alternative, that he should not be disqualified for benefits when required to accept a 40% reduction in wages.

¶16   The District Court denied Cruson's appeal.  It concluded that the Board "correctly applied the law to the underlying facts when it determined that [Cruson] did not voluntarily leave his employment with good cause attributable to the employer."  Cruson appeals.

**STANDARD OF REVIEW**

¶17   When a district court reviews a decision by the Board, the court reviews conclusions of law for correctness.  *Sayler v. Dep't of Labor & Indus.*, 2014 MT 255A, ¶ 13, 376 Mont. 369, 336 P.3d 358 (citation omitted).   If supported by substantial evidence, the Board's findings of fact are conclusive, even if the court finds a preponderance of the evidence to the contrary.  *Johnson v. W. Transp., LLC*, 2011 MT 13, ¶ 17, 359 Mont. 145, 247 P.3d 1094 (citations omitted).  The same standards apply to this Court's later review of the district court's decision.  *Sayler*, ¶ 13 (citation omitted).

**DISCUSSION**

¶18  *Whether the District Court erred when it affirmed the Board's conclusion that Cruson was disqualified for unemployment benefits because his voluntary termination did not constitute "good cause attributable to the employer."*

¶19  A claimant "must be disqualified for benefits if the individual has left work without good cause attributable to the individual's employment." Section 39-51-2302(1), MCA. A claimant has left work with good cause attributable to employment if the claimant: (1) had compelling reasons arising from the work environment that caused the claimant to leave; (2) attempted to correct the problem in the work environment; and (3) informed the employer of the problem and gave the employer a reasonable opportunity to correct it. Section 39-51-1214(2)(a), MCA; Admin. R. M. 24.11.457(1)(a). "Compelling reasons" as used in Admin. R. M. 24.11.457(2), in pertinent part, include but are not limited to:

> (a) undue risk, as compared to work in similar occupations or industries, of injury, illness, physical impairment, or reasonably foreseeable risks to the claimant's morals;
>
> (b) unreasonable actions by the employer concerning hours, wages, terms of employment or working conditions, including, but not limited to, reductions of 20 percent or more in the claimant's customary wages or hours.

¶20  According to Cruson, the Board's findings of fact support all the elements of the "good cause attributable to the employer" standard. Cruson argues that the "compelling reason" element is met because 1) he faced an undue risk of losing his "license and livelihood" when MEC linemen performed improper work, and 2) the offered apprentice position paid significantly less than his current master electrician position. Cruson

7

stresses that the Montana State Electrical Board can punish any licensed electrician who allows his license to be violated. Cruson asserts that MEC, as the power supplier utilizing Cruson's license, had a duty to prevent employees from violating that license. Cruson contends that if he allowed improper work to occur at MEC, he "would be complicit in allowing unsafe conditions to exist on his watch."

¶21 Cruson argues that "nothing in the 'good cause attributable to the employer' standard requires an employee to accept a lower-paying position in order to remedy the employer's violation of the law." Cruson cites to Admin. R. M. 24.11.457(2)(b) defining a compelling reason to include "reductions of 20% or more in the claimant's customary wages or hours." Cruson claims that he would have incurred a 40% decrease in wages had he accepted the apprentice lineman offer—thereby giving him a compelling reason to reject the offer and terminate his employment.

¶22 Cruson next argues that the Board's factual findings support the second element of the statutory good cause standard because he "did everything he possibly could" to fix the problems at MEC. Cruson asserts that he voiced his concerns to "multiple" MEC managers. Cruson points out that Hayden acknowledged receiving complaints from Cruson on a quarterly basis. Cruson also states that he shared his concerns with the lead inspector for the Missoula County Buildings Department and the head of the State of Montana Electrical Division.

¶23 Cruson argues that the Board's findings support the third element of the "good cause attributable to the employer" standard because he reported the improper work to

management, giving MEC a reasonable opportunity to correct the problem. Cruson points out that Hayden acknowledged the problem and accepted that it was his responsibility to fix it. Cruson asserts that Hayden nonetheless never disciplined any MEC managers or linemen and that the problems persisted up until "just days before he quit"—when he discovered three instances of work having been performed by unqualified employees. Cruson contends that he provided MEC management "nearly three full years to do something about linemen violating his license to no avail."

¶24 MEC argues that Cruson did not have a "compelling reason" to leave work because he had not been disciplined for the issues he complained of while working for MEC and thus his license was never at risk. Further, MEC rejects Cruson's contention that the lower paying lineman position gave him a compelling reason to quit because MEC never requested Cruson to take a pay cut; Cruson applied for the job on his own volition; and Cruson indicated he was financially able to absorb the loss and was willing to take the position despite the pay cut.

¶25 MEC asserts that it had corrected, or was working to correct, all of Cruson's concerns. MEC claims that "Hayden took Cruson's concerns seriously and attempted to correct the issues as they arose." MEC emphasizes that Hayden implemented a computer system to review work orders and advised supervisors to instruct linemen that they were not permitted to perform electrical work. MEC underscores the fact that Hayden and MEC contacted both a Missoula County employee and the Montana State Electrical Board regarding the scope of practice for linemen versus electricians to ensure that

9

MEC's employees were performing their work consistent with laws and regulations. MEC claims that subsequent incidents, where employees performed work beyond their qualifications, were never brought to Hayden's attention until after Cruson quit. It contends that MEC "cannot be faulted for not correcting problems that Cruson did not bring to [its] attention and of which it had no knowledge."

¶26    The hearing officer entered findings of fact and ultimately concluded that Hayden and MEC took Cruson's concerns seriously and attempted to address his concerns as they arose. The hearing officer noted that Hayden's testimony was "clear, direct, and sounded sincere." The hearing officer also found that because the apprentice lineman position was governed by a collective bargaining agreement and joint apprenticeship training agreement, it was unreasonable for Cruson to believe that he would continue receiving the same hourly wage as a master electrician. Finally, the hearing officer noted that, even after Cruson refused the lineman position, he could have continued his employment working as a master electrician.

**The Board's Findings of Fact**

¶27    In a judicial proceeding to review the Board's determination of a claim for unemployment benefits, "the findings of the board as to the facts, if supported by evidence, and in the absence of fraud, shall be conclusive and jurisdiction of [the] court shall be confined to questions of law." Section 39-51-2410(5), MCA. When reviewing a final agency decision, substantial evidence requires "more than a scintilla of evidence, but less than a preponderance of the evidence." *Somont Oil Co. v. King*, 2012 MT 207,

10

¶ 19, 366 Mont. 251, 286 P.3d 585 (citing *Johnson*, ¶ 17). Applying this standard, we have reversed the Board's findings of fact when they were "plainly not supported by the record or where the Board failed to review the record in making its decision." *Somont*, ¶ 19 (citing *Mont. Dep't of Corr. v. State Dep't of Labor & Indus.*, 2006 MT 298, ¶¶ 19-21, 334 Mont. 425, 148 P.3d 619 (reversing the Board's decision where the Board reversed the hearing officer without reviewing the record)). Judicial review of the Board's decision should not involve reconsideration of the evidence. *Somont*, ¶ 21 (citing *Johnson*, ¶ 18). "It is not our job to weigh conflicting evidence presented to the Board." *Gypsy Highview Gathering Sys., Inc. v. Stokes*, 221 Mont. 11, 15, 716 P.2d 620, 623 (1986). Rather, we determine only "whether there is evidence to support the Board's findings." *Gypsy Highview*, 221 Mont. at 15, 716 P.2d at 623.

¶28 Here, the Board reasonably concluded that the findings, as made by the hearing officer, were supported by the evidence. The Board based its decision on its review of the entire record, as well as arguments and closing comments from both parties as to the relevant criteria under Admin R. M. 24.11.457. The Board provided specific reasons in its final decision for affirming the hearing officer's findings. The District Court, in turn, determined that the findings affirmed by the Board were supported by substantial evidence "even though there may also have been some evidence to the contrary." Like the District Court, we need not determine whether this Court would reach the same conclusion on the evidence presented. *Johnson*, ¶ 18. Based on our own review of the

11

record and the substantial evidence supporting the Board's decision, we agree with the District Court.

¶29    In his reply brief, Cruson references and attaches a Montana State Electrical Board complaint proceeding entitled, *In the Matter of the Proposed Discipline of Case No. 2013-ELE-LIC-1600* (Stipulation and Final Order).  While not part of the record before the Board or the District Court, Cruson asserts that this Court should take judicial notice of the complaint "because it undermines [MEC's] assertion that the law was unclear and that [Cruson's] license was never at risk."

¶30    We generally do not take judicial notice of evidence not presented to the district court.  *Holtz v. Babcock*, 143 Mont. 341, 373, 390 P.2d 801, 802 (1964) (quoting 20 Am. Jur. *Evidence*, § 27 (1936) ("the general rule is that if the attention of the trial court is not called to a fact within its judicial knowledge and such fact is not judicially noticed, the appellate court will not take judicial notice of it")).  This rule is particularly apropos here, where our review is confined to whether the Board had substantial evidence for its decision.  In any event, we disagree with Cruson's assertion.  The stipulation and order in the complaint proceeding—issued in late 2014—do not prove any fact relevant here other than that that MEC acknowledged that linemen should not have performed certain electrical jobs without a license.  MEC acknowledges the same in this appeal.

**The Board's Conclusions of Law**

¶31    In deciding whether the Board's legal conclusions are correct, we review the record of all prior proceedings.  *See Mont. Dep't of Corr.*, ¶ 24.  "We apply a deferential

12

standard of review to an agency's interpretation in matters of its expertise." *Somont*, ¶ 18 (citing *Gypsy Highview*, 221 Mont. at 16, 716 P.2d at 623 (deferring to the Board's conclusion as to unsafe working conditions because the Board had expertise in the area and was in better position to determine safety)).

¶32  Cruson argues that the Board erred as a matter of law by determining that MEC's attempt to fix Cruson's complaints "as they arose" satisfies the "good cause attributable to the employer" standard.  Cruson argues that the plain language of the standard in Admin. R. M. 24.11.457 requires an employer, once on notice, to correct the problem, not just to attempt to correct it.  Cruson asserts that the statute does not merely require the employer to react in a reasonable time, but actually to fix the problem.

¶33  Cruson also claims that the Board erred when it concluded that Cruson could have remained employed as MEC's master electrician despite the problems of which he complains.  To support his claim, Cruson cites to *Gypsy Highview*, where we stated that "an employee need not wait to be seriously injured before acting to remove himself from an unsafe working environment."  *Gypsy Highview*, 221 Mont. at 16, 716 P.2d at 623.

¶34  MEC contends that Cruson's argument "requests this Court to substitute its view of what is a 'reasonable opportunity' to correct."  MEC asserts that the statute neither defines "reasonable opportunity" nor does it require that the employer "immediately and completely correct the issue, without exception."  MEC claims that it was not until February 2013, when it received correspondence from the Montana State Electrical Board, that it learned that certain electrical work is outside the scope of a lineman's

13

practice. MEC also claims that Cruson failed to inform Hayden of his subsequent discovery of events where MEC employees performed work for which they were not qualified.

¶35 We agree with MEC that whether an employer had a "reasonable opportunity" to correct an issue is left to the fact finder—in this case, the Board. The Board concluded that Cruson's reasons for leaving were personal and that there was no unreasonable action by MEC. The Board cited to the evidence to support this determination. The facts reasonably may be interpreted to support the Board's legal conclusion. Whether an employer takes sufficient action to respond to an employee's legitimate complaints is not a determination that a reviewing court should second-guess under the standard prescribed by § 39-51-2410(5), MCA. While Cruson may have had good personal reasons to leave his job at MEC, evidence supports the Board's decision that those reasons were not "compelling," as defined by Admin. R. M. 24.11.457(2), in light of MEC's responsive actions. The hearing officer found no indication that Cruson's license was ever at risk, and MEC did not reduce Cruson's wages or compel him to seek a lower-paying position. Substantial evidence also supports the Board's decision that MEC did not act unreasonably and had corrected, or was working to correct, problems within a reasonable time period by tracking work orders, instructing employees to work within the scope of their licensure, and changing internal policies.

14

## CONCLUSION

¶36    Because the Board's factual findings were supported by substantial evidence, its legal conclusion—that "good cause attributable to the employer" has not been shown under § 39-51-1214(2)(a), MCA, or Admin. R. M. 24.11.457(1)(a)—was correct. Accordingly, the judgment of the District Court is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE